# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MARK ALLEN ANGELICO,
  *Plaintiff,*

  v.

ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY ADMINISTRATION,
  *Defendant.*

No. 3:18-cv-1976 (VAB)

## RULING AND ORDER ON MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Mark Allen Angelico ("Plaintiff") has filed an administrative appeal under 42 U.S.C. § 405(g) seeking review of the Commissioner of Social Security's[1] ("Defendant" or the "Commissioner") decision denying him disability insurance benefits. Mr. Angelico has moved to reverse the Commissioner's decision, while the Commissioner has moved to affirm its decision.

For the following reasons, the motion to reverse the Commissioner's decision is **GRANTED in part**, and the motion to affirm the Commissioner's decision is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

The Court assumes familiarity with the background of this case. *See* Tr. at 762-96 (Recommended Ruling on Pl.'s Mot. to Reverse the Decision of the Comm'r and on Def.'s Mot. to Affirm the Decision of the Comm'r, *Angelico v. Colvin*, No. 3:15-cv-831 (JGM) (SRU), ECF No. 17 (Feb. 8, 2017) ("Recommended Ruling")).

---

[1] This role is currently filled by Andrew Saul, who is automatically substituted as a party under Rule 25(d) of the Federal Rules of Civil Procedure.

## 1. Prior Underlying Procedural History Appeal

On December 12, 2011, Mr. Angelico filed a Title II application for disability and disability insurance benefits claiming that he was disabled under the Social Security Act ("SSA") since December 31, 2006 due to back and neck problems, espispadius, high cholesterol, and having only one kidney and no bladder. Tr. at 77, 88. The claim was initially denied on February 12, 2012, and denied again on May 30, 2012 upon reconsideration. *Id.* at 97-100, 103-05.

On September 7, 2012, Mr. Angelico filed a written request for a hearing, and on November 13, 2013, a video hearing was held in New Haven, Connecticut. *Id.* at 41-76, 106-09. Administrative Law Judge ("ALJ") Mattie Harvin-Woode presided from St. Louis, Missouri. *Id.* at 41-76. Mr. Angelico and a vocational expert testified. *Id.*

On January 27, 2014, ALJ Harvin-Woode denied Mr. Angelico's claim for disability benefits, and found that he was not disabled under the Social Security Act from December 31, 2006 through December 31, 2011, the date last insured. Tr. at 17-36.

On February 20, 2014, Mr. Angelico filed his request for review of the hearing decision, *id.* at 13-16, and on March 23, 2015, the Appeals Council denied his request, thereby rendering the ALJ's decision the Commissioner's final decision, *id.* at 7-9.

Mr. Angelico appealed that decision to the United States District for the District of Connecticut (this "District"), and on February 8, 2017, the Honorable Joan G. Margolis issued a Recommended Ruling granting in limited part Mr. Angelico's motion to reverse the decision of the Commissioner. Tr. at 762-96. Judge Margolis found that remand was appropriate so that the Administrative Law Judge ("ALJ") could request a medical source statement as to Mr. Angelico's functional limitations from Dr. Rahul. S. Anand, his pain management specialist and

treating physician. *Id.* at 793-96.

On March 27, 2017, the Honorable Stefan R. Underhill approved and adopted the Recommended Ruling, and the judgment was entered the next day. Tr. at 797.

On August 26, 2017, the Appeals Council affirmed the decision and remanded Mr. Angelico's case to an ALJ. Tr. at 754-55.

## 2. Activities of Daily Life and Hearing Testimony

Mr. Angelico has a high-school education, and attended night school for three years to become an electrician, but did not graduate from that program. Tr. at 48-49, 174, 718. He claims he worked as a self-employed carpenter until 2006, *id.* at 49, 53-54, and has managed a family-owned café, *id.* at 68-69. In a typical day, Mr. Angelico claims he has to lie down every couple of hours, because of his back pain, which also makes his "legs turn numb." *Id.* at 52. His areas of pain or numbness include his back, neck, and shoulders. *Id.* at 54. He also has had several operations on his kidney, bladder, and intestines, and has swollen ankles. *Id.* at 54, 56. Mr. Angelico has no bladder, and has an ileostomy bag that leaks "all the time," *id.* at 726, as well as unpredictably, *id.* at 731-32. *See* Tr. at 52 (needing to take a break during first hearing because bag was leaking); *see id.* at 57-58 (same); *see id.* at 724-25 (needing to take a break during second hearing because bag was leaking); *see id.* at 738 (same).

On December 3, 2007, Mr. Angelico noted that he "continues with his carpentry work," and had been on a "weekend out with his buddies." *Id.* at 312.

On June 19, 2008, he reported "over 'doing it' at work," and that his "right back is excruciating." *Id.* at 300.

On June 16, 2010, he reported he "remain[ed] active performing yardwork and exercising." *Id.* at 405. On August 30, 2010, his back pain had worsened, and he attributed "the

exacerbation of his symptoms to excessive activity (cutting down a tree)." *Id.* at 396. On

December 15, 2010, he "remain[ed] active in the community, working and hunting." *Id.* at 382.

On January 10 and February 7, 2011, he shoveled snow. *Id.* at 374, 378. On March 7,

2011, he "continue[d] to lead an active lifestyle (hunting, performing minor household chores,

etc.)." *Id.* at 370.

On May 2, 2011, Mr. Angelico continued to "hunt and remodel his bathroom," and Dr.

Anand wrote that "[h]is pain regimen has allowed him to be functional." *Id.* at 363. Later that

month, on May 31, his pain worsened "after working on a bathroom and the yard." *Id.* at 360. On

August 22, 2011, he continued "to perform his daily activities, including light yard work." *Id.* at

346.

On January 4, 2012, Mr. Angelico completed a questionnaire about his ability to

function, and described that his daily activities included feeding his children breakfast, shopping,

and driving them to Tae Kwan Do. *Id.* at 180-89. He listed his hobbies as fishing, hunting,

watching television, and basketball, but noted that he no longer plays basketball and does not

fish or hung like he "used to," and now "watch[es] T.V. everyday." *Id.* at 183.

Melissa Bradfield, the vocational witness at the November 13, 2013 hearing, testified that

Mr. Angelico's previous carpentry work was performed at the heavy level, and his previous bar

manager work was performed at the light level. *Id.* at 67. When he had no construction work, Mr.

Angelico would stock liquor and beer in the basement of the café. *Id.* at 69. According to him, he

was "like a manager there," *id.* at 68, but all he did was bring up whatever supplies were needed,

bring the liquor down, put it on the shelves and in holders, *id.* at 70. He never bartended. *Id.* at

71. Based on Mr. Angelico's explanation of his work, Ms. Bradfield changed her description of

his past work from liquor establishment manager to bartender helper, which is performed at the medium level. *Id.* at 71.

In response to ALJ Harvin-Woode's hypothetical of an individual with Mr. Angelico's limitations[2], Ms. Bradfield testified that such a person could not perform Mr. Angelico's past work, but could work as a furniture rental clerk, housekeeping cleaner, or booth cashier. *Id.* at 71-74. She noted that if an individual needed to use the bathroom every half hour or hour, a work accommodation would be needed, but such a person could not work if he needed to lay down every two or three hours. *Id.* at 74-75.

On June 12, 2018, ALJ Ronald J. Thomas held a hearing on remand, where Mr. Angelico and vocational witness Christine Spaulding testified. Tr. at 715-750. Mr. Angelico stated again that he worked as a bar owner and manager at Scruples, the family owned café, in the late 1990s. Tr. at 739-40. He employed about ten people in this role. *Id.* at 740. As a carpenter, he was a sole proprietor. *Id.* at 742.

Ms. Spaulding testified that Mr. Angelico's past work as a liquor establishment manager is generally performed at the light level, but medium as performed by him, and the past carpentry work is generally performed at the medium physical demand level but heavy as performed by him. *Id.* at 743-45. In response to ALJ Thomas's hypothetical of an individual with Mr. Angelico's age, education, past relevant work experience, who is limited to the sedentary exertion level as defined, and unable to stay on task for more than eighty percent of the time due to multiple limitations, Ms. Spaulding testified that such an individual could not perform Mr. Angelico's past relevant work. *Id.* at 745. In fact, she opined that based on that hypothetical,

---

[2] An individual limited to light level work, with occasional climbing, stooping, kneeling, crouching, crawling; frequent balancing; avoiding concentrated exposure to vibration, extreme cold temperatures, extreme heat, wetness, humidity, fumes, odors, gas; and limited to standing for sixty minutes before having to sit for five minutes. Tr. at 72-74.

"there could be no work that could be sustained."

ALJ Thomas posed a second, unrelated hypothetical, of an individual with Mr. Angelico's age, education, and past relevant work experience, who is limited to work at the light level, and has further limitations as follows: occasional bending and twisting, squatting and balancing, crawling, kneeling, and climbing, but no climbing of scaffolds ropes, and ladders; needs an environment free from heights, vibration, dangerous machinery, concentrated poor ventilation, dust, fumes, gases, humidity, odors, wetness, and temperature extremes, but can drive. *Id.* at 746. Ms. Spaulding testified that such an individual could perform Mr. Angelico's past work as a liquor establishment manager as it was generally performed, but not as he performed it. *Id.* In addition, she noted that such an individual could work as a mail sorter, fast food worker, or cashier. *Id.* at 746-47.

At the time of the second hearing, Mr. Angelico was fifty-five years old and living with his wife, with whom he has twins, then seventeen years old. Tr. at 717.

### 3. Material Medical History and Chronology

Mr. Angelico's medical history has been extensively detailed in Judge Margolis's Recommended Ruling. *See* Tr. at 799-80. The Court will thus only refer to this information as necessary, and focuses its summary to Mr. Angelico's medical records subsequent to September 26, 2013.

On August 22, 2007, Mr. Angelico first saw Dr. Anand, a pain management specialist at Connecticut Pain and Wellness Center, LLC ("CPWC"), Tr. at 321-23, and saw him as recently as May 3, 2018, Tr. at 1611-14. *See also id.* at 722 (testifying at the June 12, 2018 hearing that he saw Dr. Anand "the other day" and goes "every month"). But because Mr. Angelico's date last insured is December 31, 2011, the relevant time frame is shorter. *Id.* at 698, 795 n.13.

On August 2, 2012, Mr. Angelico saw Dr. Geoffrey Gladstein, a rheumatologist, for "severe pain in the feet." Tr. at 519-22. He returned on August 22, and Dr. Gladstein noted that the inflammation in his right ankle was "probably gout, [and] resolving." *Id.* at 526-28.

On October 31, 2013, Mr. Angelico reported the following ailments to Dr. Steven J. Urciuoli, his primary care physician: neck pain increased by head movement, radiating to the shoulder, and causing inability to sleep, as well as neck muscle tightness, back pain, and worsening claustrophobia. *Id.* at 1615-17.

On November 13, 2013, Dr. Anand performed a left C3, 4, 5, 6, Medial Branch Block ("MBB"), Mr. Angelico's twenty-second MBB, and a C3-4, C4-5, C5-6, and partial C2-3 and C6-7 radiofrequency ablation/rhizotomy, *id.* at 1310-11, which improved his pain, *id.* at 1312-15.

On January 15, 2014, Dr. Anand performed Mr. Angelico's twenty-third MBB and his twentieth C3-4, C4-5, C5-6, and partial C2-3 and C6-7 radiofrequency ablation/rhizotomy. *Id.* at 1316-17. These procedures lessened the severity of Mr. Angelico's neck pain, but his lower back pain remained severe. *Id.* at 1321.

On March 6, 2014, Dr. Anand performed two more procedures: Mr. Angelico's twenty-fourth MBB and twenty-first radiofrequency ablation/rhizotomy. *Id.* at 1329-30.

On April 9, 2014, Dr. Anand reported that Mr. Angelico complained of neck and low back pain, and that "his oral pain regimen is slowly losing efficacy." *Id.* at 1331-34.

On May 5, 2014, Dr. Anand performed Mr. Angelico's twenty-fifth MBB and twenty-second radiofrequency ablation/rhizotomy, *id.* at 1335-36, which significantly improved back pain, but worsened neck pain, *id.* at 1339.

On September 8, 2014, Mr. Angelico complained to Dr. Anand about worsening back and neck pain, claiming that "his quality of life is poor and . . . difficulty completing his daily activities." *Id.* at 1397.

On November 24, 2014, Dr. Anand administered a transforaminal epidural steroid injection ("TFESI"). *Id.* at 1413.

On January 6, 2015, Dr. Anand performed a lumbar MRI on Mr. Angelico. *Id.* at 1633-34. At his follow-up ten days later, Mr. Angelico reported that back pain improved, but neck pain worsened. *Id.* at 1418-21.

On February 15, 2016, Dr. Anand stated that the prescribed Percocet "provides significant relief and allows [Mr. Angelico] to ambulate and complete his household chores." *Id.* at 1481.

On August 4, 2017, Mr. Angelico was seen at a Bridgeport Hospital facility due to leakage of his urostomy pouch. *Id.* at 1042-57. He claims that "[h]is  closest friends and children are unaware he has urostomy." *Id.* at 1042. His hospital notes stated that the pouch "leaks almost daily." *Id.* at 1047.

On March 8, 2018, Dr. Anand noted that Mr. Angelico's current pain regimen "allows him to perform light housework and climb the stairs at his home." *Id.* at 1603; *see also id.* at 1607-10 (same prognosis for April 5, 2018 visit).

On May 3, 2018, the final medical record before the Court, Mr. Angelico's pain regimen provided "significant relief," and he pronounced he was "doing pretty good," claiming the warmer weather had helped. *Id.* at 1611-14.

Mr. Angelico has had ongoing neck and back pain, *see, e.g.*, Tr. at 1438-41, with numerous procedures, which he claims total thirty-three MBBs and thirty-two radiofrequency ablations/rhizotomies, *id.* at 1597-98.

### 4. Medical Opinions

On December 30, 2011, Dr. Urciuoli completed a Work Related Physical and Mental Abilities form for Connecticut Disability Determination Services. Tr. at 410. According to Dr. Urcioli, Mr. Angelico could continuously, or over seventy percent of the time, sit, push/pull, use fine hand/eye coordination, and meet mental demands; frequently, or forty to sixty-nine percent of the time, stand, walk, and bend; and occasionally, or fifteen to thirty-nine percent of the time, lift one to fifteen pounds, carry or climb; and rarely, or up to fifteen percent of the Time, lift more than fifteen pounds. *Id.*

On February 21, 2012, Dr. Kurshid Khan, a non-examining State-agency physician, completed a Physical Residual Functional Capacity Assessment of plaintiff. Tr. at 77-86. According to Dr. Khan, Mr. Angelico could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand, walk, and/or sit for six hours in an eight hour workday; occasionally climb, stoop, kneel, crouch and crawl; and frequently balance. *Id.* at 82-83. Additionally, he opined that Mr. Angelico must avoid concentrated exposure to vibrations. *Id.* at 83.

On May 30, 2012, Dr. Firooz Golkar, another non-examining State-agency physician, reached the same conclusions as Dr. Khan, *id.* at 91-93, with the added limitations of avoiding concentrated exposure to extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation. *Id.* at 92-93.

On October 22, 2013, Dr. Gladstein signed off on a statement prepared by Mr. Angelico's then-counsel, indicating that he agreed with the following:

> Mr. Angelico has indicated to me that because of his ankle swelling and pain he is unable to stand or walk for significant periods of time and, if required to be employed, would be limited to sedentary work which would allow him to sit at least 6 out of 8 hours in a work day. He states he would not be capable of doing work as a cashier or sales clerk, or any other type of work, that necessitated he be on his feet at least 6 out of 8 hours.

Tr. at 694.

### 5. ALJ Decision

On October 2, 2018, after careful consideration of the entire record, ALJ Thomas again denied Mr. Angelico's claims. Tr. at 695-713. ALJ Thomas noted that, as the remand order required, he contacted Dr. Anand and sent him a medical source statement to complete on more than one occasion, *id.* at 698 (citing Exs. 27E, 28E, and 20F), but Dr. Anand did not respond. In addition, Mr. Angelico's counsel was similarly "unable to furnish a medical source statement from Dr. Anand." *Id.*

ALJ Thomas made seven factual and legal conclusions in his decision:

1. Mr. Angelico met the insured status requirements of the Social Security Act through December 31, 2011. *Id.* at 701.

2. Mr. Angelico did not engage in substantial gainful activity during the period from his alleged onset date of December 31, 2006, through his date last insured of December 31, 2011. *Id.*

3. Through the date last insured, Mr. Angelico had the following severe impairments under 20 CFR 404.1520(c): degenerative disc disease of the lumbar and cervical spine. *Id.* at 701-02.

4. Through the date last insured, he did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR, Part 404, Subpart P, Appendix 1. *Id.* at 702.

5. Through the date last insured, Mr. Angelico had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasional twisting, squatting, bending, balancing, crawling, kneeling and claiming. In addition, he had to avoid climbing of ladders, ropes, or scaffolds; avoid hazards such as heights, vibration, and dangerous machinery, but driving is okay; and avoid an environment with concentrated poor ventilation, dust, fumes, gases, odors, humidity, wetness, and temperature extremes. *Id.* at 702-05.

6. Through the date last insured, Mr. Angelico was capable of performing past relevant work as a liquor establishment manager, which did not require the performance of work-related activities precluded by his residual functional activity. Alternatively, he could perform other jobs in the national economy, specifically mail sorter, fast food worker, or cashier. *Id.* at 705-07.

7. Between December 31, 2005, the alleged onset date, and December 31, 2011, the date last insured, Mr. Angelico was not under a disability under the Social Security Act. *Id.* at 707.

Mr. Angelico did not file any written exceptions to ALJ Thomas's decision, and the Appeals Council did not undertake "own motion review," so ALJ Thomas's decision became the final, appealable decision of the Commissioner sixty-one days after it issued. Tr. at 696.

### B. Procedural Background

On December 5, 2018, Mr. Angelico filed a Complaint against Nancy A. Berryhill, then-Acting Commissioner of Social Security, to appeal ALJ Thomas's decision denying him disability benefits. Compl., ECF No. 1 (Dec. 5, 2018).

On January 30, 2019, the Commissioner filed the relevant Social Security Transcripts. Tr., ECF No. 9 (Jan. 30, 2019).

On September 17, 2019, Mr. Angelico moved to reverse the Commissioner's decision. Mot. to Reverse the Decision of the Comm'r, ECF No. 14 (Sept. 17, 2019) ("Pl.'s Mot."); Pl.'s Statement of Material Facts, ECF No. 14-1 (Sept. 17, 2019) ("Pl.'s SMF"); Mem. of Law in Suppl. of Pl.'s Mot., ECF No. 14-2 (Sept. 17, 2019) ("Pl.'s Mem.").

On November 13, 2019, the Commissioner filed a supplement Social Security Transcript. Suppl. Tr., ECF No. 16 (Nov. 13, 2019) (containing pages 1664 and 1665 of the Transcript).

On November 15, 2019, the Commissioner moved to affirm its final decision. Mot. to Affirm the Decision of the Comm'r, ECF No. 17 (Nov. 15, 2019) ("Comm'r's Mot."); Def.'s Responsive Statement of Facts, ECF No. 17-1 (Nov. 15, 2019) ("Def.'s SMF"); Def.'s Mem. in Supp. of Comm'r's Mot., ECF No. 17-2 (Nov. 15, 2019) ("Comm'r's Mem.").

## II.  STANDARD OF REVIEW

Under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." *Smith v. Berryhill*, 740 F. App'x. 721, 722 (2d Cir. 2018) (summary order) (citing 20 C.F.R. § 404.1505(a)).

To determine whether a claimant is disabled, the ALJ must follow a five-step evaluation

process:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v)). "[T]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four," *see Burgess*, 537 F.3d at 128 (internal quotation marks and citation omitted), with Step Five "the burden shift[ing] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012).

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on the correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)). A district court can reverse the commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Brown v. Apfel*, 174 F.3d 59, 61 (2d Cir. 1999) (internal

quotation marks omitted) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). While the

standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Lamay*, 562 F.3d at 507 (internal quotation marks and citations omitted). "[A district court] must

consider the whole record, examining the evidence from both sides, because an analysis of the

substantiality of the evidence must also include that which detracts from its weight." *Petrie v.

Astrue*, 412 F. App'x. 401, 403–04 (2d Cir. 2011) (summary order) (quoting *Williams ex rel.

Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)) (internal quotation marks omitted).

To determine "whether the agency's findings are supported by substantial evidence, 'the

reviewing court is required to examine the entire record, including contradictory evidence and

evidence from which conflicting inferences can be drawn.'" *Talavera v. Astrue*, 697 F.3d 145,

151 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per

curiam)). "Even if the Commissioner's decision is supported by substantial evidence, legal error

alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322,

328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). When "the

Commissioner's decision applies the correct legal principles and is supported by substantial

evidence, that decision will be sustained." *Kumar v. Berryhill*, 3:16-cv-1196 (VLB), 2017 WL

4273093, at *4 (D. Conn. Sept. 26, 2017) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir.

1982)).

## III.    DISCUSSION

Mr. Angelico raises four claims of error: (1) the administrative record was not developed; (2) the ALJ's analysis of the urological issues is deficient; (3) the ALJ's step four findings are unsupported; and (4) the ALJ's step five findings are unsupported.

### A.  The Development of the Administrative Record

An ALJ has an "affirmative duty to compile a complete record" when ruling on eligibility. *Brown*, 174 F.3d at 63. The ALJ must "not only develop the proof but carefully weigh it." *Donato v. Sec'y of Dep't of Health and Human Servs.*, 721 F.2d 414, 419 (2d Cir. 1983). Accordingly, the district court conducts "a plenary review of the administrative record to determine whether, considering the record as a whole, the Commissioner's decision is supported by substantial evidence." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw*, 221 F.3d at 131 (quoting 42 U.S.C. § 405(g)). In cases "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the district court will not substitute its "judgment for that of the commissioner." *Veino*, 312 F.3d at 586. And the district court may not "affirm an administrative action on grounds different from those conducted by the agency." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).

Mr. Angelico first argues that the record does not support the ALJ's statement that he contacted Dr. Anand "on more than one occasion." Pl.'s Mem. at 1-2. Further, Mr. Angelico contends that the letter sent on June 27, 2018 "does not meaningfully convey the centrality of [Dr. Anand's] opinions to the issues before the ALJ," *id.* at 2, especially because the Appeals

Council's remand order stated that the ALJ "will take any further action needed to complete the administrative record and issue a new decision," *id.* at 3 (emphasis omitted) (citing Tr. at 754). Mr. Angelico argues that the need for Dr. Anand's opinion as the hands-on treating physician "is particularly important here, where it is known that Mr. Angelico had conditions requiring at least 33 [MBB] procedures, 32 radiofrequency ablations, and 15 epidural steroid injections." *Id.* at 3. Mr. Angelico submits that the ALJ—being "untrained in the arts and sciences"—could not adequately assess the impact of Mr. Angelico's conditions on his functional abilities without a medical source statement from Dr. Anand, nor could the ALJ "substitute his own judgment for competent medical opinion." *Id.* at 3-5 (citations omitted). According to Mr. Angelico, "medical source statements are critical precisely because the contemporaneous treatment notes do not include the detailed, function-by-function limitations a medical source statement is designed to provide." *Id.* at 6. Mr. Angelico argues that the ALJ had the authority to and should have issued a *subpoena ad testificandum* to compel Dr. Anand's presence at the June 12, 2018 hearing or at a supplemental hearing, and that his "effort to develop the record in accordance with the orders of this Court and the Appeals Council was . . . insufficient." *Id.* at 7-8.

In response, the Commissioner submits that the ALJ made every reasonable effort to help Mr. Angelico get medical reports, including a medical source statement, because he made an initial request on June 27, 2018, and a follow-up request on August 21, 2018. Comm'r's Mem. at 3-4. The Commissioner admits there was an "inadvertent error in compiling the certified administrative record," and points to the supplemental transcript filing, Suppl. Tr., which contains the second request referenced in the original transcript. *Id.* In addition, the Commissioner contends that the record contains contemporaneous functional assessments from three physicians, including one from Dr. Urciuoli, a treating source, which all contributed to the

ALJ's determination of Mr. Angelico's residual functional capacity. *Id.* As a result, the Commissioner argues that the record is fully developed.

The Court disagrees.

The treating physician rule gives "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Greek*, 802 F.3d at 375. As to the nature and severity of a claimant's impairments, "[t]he SSA recognizes a rule of deference to the medical views of a physician who is engaged in the primary treatment of a claimant." *Greek*, 802 F.3d at 375; *see also Burgess*, 537 F.3d at 128.

As part of the ALJ's affirmative duty to develop the administrative record, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). There are, however, cases where the treating physician should not be provided controlling weight. *See, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (holding that "the option of treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in support, such as the opinions of other medical experts").

The Second Circuit has cautioned ALJs from "rely[ing] heavily on the findings of consultative physicians after a single examination." *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir.

2013); *see Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (justifying giving a consultative physician limited weight "because 'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons'" (quoting *Torres v. Bowen*, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988))). At the same time, "the report of a consultative physician may constitute [substantial] evidence." *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *see also Prince v. Astrue*, 490 F. App'x 399, 401 (2d Cir. 2013) (summary order) ("consultative examinations were still rightly weighed as medical evidence"); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("the report of a consultative physician may constitute . . . substantial evidence").

This case was previously remanded because the ALJ failed to obtain a medical source statement from Dr. Anand, Mr. Angelico's treating physician. *See* Tr. 762-96 (Recommended Ruling). Although the record contains a medical opinion from Dr. Urciuoli, Mr. Angelico only complained of back and neck pain to him, but "was treated regularly by Dr. Anand and [CPWC staff] for these ailments, and it is their records that reflect consistent invasive treatment for plaintiff's chronic pain." *Id.* at 790. In the Recommended Ruling that was adopted by Judge Underhill and affirmed by the Appeals Council, Judge Margolis emphasized the ALJ's "affirmative obligation to develop the administrative record," and that this "duty exists even when, as in this case, the claimant is represented by counsel." *Id.* at 792-93.

On remand, the ALJ ostensibly satisfied the requirements in the Code of Federal Regulations to make "every reasonable effort to help [the claimant] get medical evidence," because he made "an initial request for evidence" and "one follow-up request." 20 C.F.R. §

404.1512(b)(1). On June 27, 2018, the initial request for Dr. Anand to complete a medical source statement was made, Tr. at 985, and on August 21, 2018, a follow-up was made, *id.* at 1664. Yet, because the remand order emphasized the importance of procuring a medical source statement from Dr. Anand, the Court agrees that ALJ Thomas was required to do more to satisfy his "affirmative duty to compile a complete record," *Brown*, 174 F.3d at 63. *See* Tr. at 754 (Appeals Council order mandating that "the Administrative Law Judge will take any further action needed to complete the administrative record and issue a new decision").

Under the Code of Federal Regulations, the ALJ should have issued a *subpoena* for Dr. Anand to testify in order to fully develop the record:

> When it is reasonably necessary for the full presentation of a case, an administrative law judge or a member of the Appeals Council may, on his or her own initiative or at the request of a party, issue subpoenas for the appearance and testimony of witnesses and for the production of books, records, correspondence, papers, or other documents that are material to an issue at the hearing.

20 C.F.R. § 404.950(d)(1).

As was previously noted in the Recommended Ruling, "remand is warranted" "when the 'treatment notes and test results from [the claimant's] treating physicians do not assess how [the claimant's] symptoms limit[] his functional capacities." Tr. at 794 (internal citation omitted). The record was insufficient before, and it is insufficient now, because it still lacks a medical opinion from Dr. Anand regarding the impact of Mr. Angelico's various conditions on his functional abilities. "[T]here are inconsistencies in the treatment records of plaintiff's pain management team who consistently treated plaintiff's chronic pain with invasive medical procedures, while also noting plaintiff's active lifestyle and positive results." *Id.* at 794-95. Absent a medical opinion from Dr. Anand, these inconsistencies remain.

Although an "ALJ's conclusions would not be defective if he requested opinions from

medical sources and the medical sources refused," that is only the case if "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34-35 (2d Cir. 2013); *see Holt v. Colvin*, No. 3:16-cv-01971 (VLB), 2018 WL 1293095, at *7 (D. Conn. Mar. 13, 2018) ("Indeed, courts within this circuit have remanded when the ALJ failed to request a medical source statement from a treating physician and the medical record contained no assessments of the claimant's functional limitation." (collecting cases)). Here, the record contains a medical opinion assessing Mr. Angelico's functional limitations from a treating physician, Dr. Urciuoli, but as this Court has already held based on a case-specific inquiry, Mr. Angelico's situation is unique such that Dr. Anand's opinion is "necessary" in order for the ALJ to reach an "informed decision." *See* Tr. at 792-95 ("The issue as to whether a treating physician's opinion is necessary 'focuses on circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record.'" (citing *Sanchez v. Colvin*, No. 13 Civ. 6303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015)); *see also DeLeon v. Colvin*, No. 3:15-cv-01106 (JCH), 2016 WL 3211419, at *4 (D. Conn. June 9, 2016) ("assessing whether it was legal error for an ALJ to fail to request a medical source statement from a claimant's treating physician is a case-specific inquiry").

Accordingly, because the ALJ failed to procure from Dr. Anand an assessment of Mr. Angelico's functional limitations, and did not issue a *subpoena* as he was authorized to do by 20 C.F.R. § 404.950(d)(1), the Court finds that remand is necessary so that the ALJ may do so.

**B. The Remaining Arguments**

For the reasons explained above, Mr. Angelico's remaining arguments regarding the ALJ's analysis of his urological issues, the ALJ's Step Four findings, and the ALJ's Step Five findings, will be addressed by the ALJ on remand.

## IV.    CONCLUSION

For the reasons explained above, the Court **GRANTS in part** the motion to reverse the Commissioner's decision, and **DENIES** the motion to affirm the Commissioner's decision.

The Clerk is directed to enter judgment remanding this case for further proceedings consistent herewith.

If the case is appealed again, the Clerk of Court is respectfully directed to assign the appeal to the undersigned district court judge.

**SO ORDERED** at Bridgeport, Connecticut, this 19th day of February, 2020.

    /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge